IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville August 21, 2013

## STATE OF TENNESSEE v. TIMOTHY EUGENE KELLY, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1511   Steve R. Dozier, Judge**

_____

**No. M2012-01262-CCA-R3-CD - Filed November 15, 2013**

_____

The Defendant, Timothy Eugene Kelly, Jr., was convicted by a Davidson County Criminal Court jury of three counts of aggravated robbery, Class B felonies, and one count of assault, a Class A misdemeanor.[1]  *See* T.C.A. §§ 39-13-402; 39-13-101 (2010).  The trial court sentenced him as a Range II, multiple offender to eighteen years for the aggravated robbery convictions in Counts 1 and 4, twenty years for the aggravated robbery conviction in Count 3, and eleven months, twenty-nine days for the assault conviction.  The court ordered the Defendant to serve Counts 1 and 3 consecutively, for an effective thirty-eight-year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to sustain his convictions and (2) the trial court erred in sentencing him.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Timothy Eugene Kelly, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and J. Wesley King, III, Assistant District Attorney General, for the appellee, State of Tennessee.

_____

[1] After severing the codefendant's trial, the trial court renumbered the counts of the indictment related to the Defendant.  We will refer to the counts as renumbered.

# OPINION

This case relates to a series of aggravated robberies on Halloween night in 2009. At the trial, Randi Wright testified that on October 31, 2009, she and her friend, Hannah Wiser, went to the movies around 5:00 p.m. in the 100 Oaks area and parked in the parking lot between the Ross store and the 100 Oaks Mall. She said that when the movie ended around 7:00 p.m., they left Ms. Wiser's car in the parking lot and that she drove her mother's car to Logan's for dinner. She said that at the time of the incident, she was seventeen years old and in high school.

Ms. Wright testified that when she and Ms. Wiser returned to the parking lot where Ms. Wiser's car was parked, two men in Halloween costumes came toward them. She stated that they said "trick or treat." She said that she saw their hands and knew they were African-American, that they were not "terribly tall" but not short, that neither was overweight, and that both were average build. She believed they were both men and said she heard their voices. She said that one wore a hockey mask and that the other wore a wolf mask.

Ms. Wright testified that the man in the wolf mask went to Ms. Wiser first and that Ms. Wiser hesitated after she gave him her belongings and asked him to return her identification. She said that the men had already shown them a gun and that the man in the wolf mask pointed his gun at Ms. Wiser's hip and pushed it at her when she asked him to return her identification. She said that the man in the wolf mask asked for her money. She stated that she removed her money from her purse but that he said, "[N]o, you're a girl, you have a purse. I want everything you have." She said that she hesitated after she gave him the money and that he put a gun to the back of her head, pulled her hair, and pushed her out of the way to get into her car. She said he took her money, a GPS he pulled from the car, and her purse, which contained her keys, rings, iPod, makeup, and wallet with her debit card and identification.

Ms. Wright testified that after the men took her things, they forcefully made her and Ms. Wiser lie face down on the ground and kicked them. She said the men kicked her once but kicked Ms. Wiser continually. She said the men told them that if they looked up from the ground, the men would shoot them and told them to count to 100. She said she was afraid during the incident and did what they told her to do.

Ms. Wright testified that the man in the hockey mask ensured they did not run. She said that when one of them was being robbed, the man in the hockey mask held the other. She identified photographs of two rings, an iPod that read "Randi Wright's iPod" when turned on, and her debit card that were in her purse that night. She said she had the items in the courtroom that day.

Ms. Wright testified that they drove her car to the front of the movie theater, called 9-1-1, and went inside to talk to the police. She said that she spoke with the police not long after the incident but that Ms. Wiser went to the hospital before the police arrived. She said that the men showed a gun when they first walked up and that they pointed a gun at her head and Ms. Wiser's hip.

On cross-examination, Ms. Wright agreed that the incident occurred two years earlier and at night. She was sure that the men wore wolf and hockey masks and that they both had guns. She said the man in the wolf mask took her things. She said that the other man held her and Ms. Wiser while they were robbed, that he held her with his hand when Ms. Wiser was being robbed, and that he pointed a gun at Ms. Wiser's hip when Ms. Wright was being robbed. She said the man in the hockey mask did not point a gun at her when he held her. She saw both men with different black guns. She did not see the man who took her property give the other man anything. She agreed the man who did not point a gun at her did not say anything or take anything from her.

Hannah Wiser testified that on October 31, 2009, she and Randi Wright went to a movie and Logan's for dinner in the 100 Oaks area. She said they took Ms. Wright's car to dinner and returned to the theater to get her car afterward. She said that when they returned to her car in the parking lot, two men demanded everything from their pockets and her purse.

Ms. Wiser testified that two men approached them and that she first noticed the man wearing the hockey mask. She said that she knew he was African-American because of his hands, that his voice was deep, and that she could tell by his body language that it was an "aggressive encounter." She said that the man in the hockey mask wore a "hoodie" and blue jeans and that the man in the wolf mask wore a costume dress with fake blood. She did not see either man's face because of the masks.

Ms. Wiser testified that the man wearing the hockey mask approached her and said "trick or treat or some smart aleck type thing." She believed he was joking but said he pointed a black gun at her hip. She said the man in the wolf mask patted her down and took her keys, gum, and wallet with her identification and about $100. She said that the man in the hockey mask held her arm and kept the gun pointed at her left hip and that she could do nothing but stand there.

Ms. Wiser testified that after the man in the wolf mask emptied her pockets, he turned to Ms. Wright, who was standing three or four feet in front of her. She said that Ms. Wright opened her car door and reached to give the man in the wolf mask her money but that the man pushed her and grabbed her hair. She said the man got into the car and took Ms. Wright's purse and GPS. She said the man in the wolf mask reached in his pocket and held

something to Ms. Wright's head. She could not see if it was a gun but assumed it was. She said that the man in the hockey mask held her arm and kept the gun pointed at her hip while the other man was with Ms. Wright. She said that she "protested" about the man in the wolf mask being rough with Ms. Wright and that the man told her not to "be a hero" and not to "try anything funny."

Ms. Wiser testified that when the man in the wolf mask left Ms. Wright's car, the men ordered them to the ground. She did not see what happened to Ms. Wright but said the man in the hockey mask pushed her to the ground. After she was on the ground, she heard one of the men kick Ms. Wright once, and they kicked her three or four times in her ribs and the back of her head. She did not know who kicked her. She said the men told them to count to 100 and not to get up or the men would shoot them. She said that they stayed on the ground for around two minutes and that she called her mother. She said that both men wore masks the entire time and that she did not see where they went.

Ms. Wiser testified that they drove to the front of the theater and went inside to talk to the security guard. She remembered telling the security guard what happened then lying on the ground but did not remember much afterward. She remembered being in the hospital but did not remember how she arrived. She said that she had pain in her ribs but did not know if they were broken and that nothing was wrong with her head. She said she saw a therapist after the incident, who told her she had post-traumatic stress disorder.

Ms. Wiser testified that she reviewed the video recordings from the parking lot cameras and was able to see where her car was parked and what happened. Ms. Wiser explained what was happening in the recordings as they were played for the jury. She described where her car was parked at the end of the tree line and pointed to Ms. Wright's car as it pulled beside her car. After the portion of the recording showing the incident was played for the jury, Ms. Wiser testified that it had shown the two men with masks rob them and walk toward a store at the front of 100 Oaks Mall. She said she and Ms. Wright were still lying on the ground waiting. The video recording from another camera at a different angle was also played. Ms. Wiser said the recording showed the front of Ross and showed the two men walking away after robbing them.

Ms. Wiser testified that she was seventeen years old and in high school at the time of the incident. She identified photographs of the costume gown with fake blood that the man in the wolf mask wore.

On cross-examination, Ms. Wiser testified that the man in the hockey mask pointed the gun at her and that it was incorrect if someone stated the man in the wolf mask pointed the gun at her. She said she saw one gun clearly. She said that when the man in the hockey

mask pointed the gun at her, the man in the wolf mask patted her down for her belongings in her pockets. She said that the man in the wolf mask took her property and that she did not see him give it to anyone else. She said the man in the wolf mask took Ms. Wright's property while the man in the hockey mask pointed a gun at her. She did not clearly see the man in the wolf mask with a gun.

Vanderbilt Police Sergeant Steven Engstrom testified that he received a call on October 31, 2009, for 100 Oaks and that he arrived at the movie theater around 8:15 p.m. He said that an ambulance took one of the victims to the hospital and that the other victim remained to speak with him.

Domanique Lindsey testified that on October 31, 2009, he and his friend, Damian Rucker, were robbed when they were leaving an apartment complex near Murfreesboro Pike to attend a Halloween party. He said that he drove that night and that he was about to pull out of the apartment complex when a blue car pulled beside them. He said that a woman drove the blue car and that two men, later identified as the Defendant and Javaelon McDonald, got out of the car. He said that Mr. Rucker and the woman driving the blue car "exchanged words" because they wanted her to move her car. He said the two men "ripped" open his car doors. He said that Mr. McDonald approached the passenger's side near Mr. Rucker and waved a gun inside the car. He said the Defendant, who approached the driver's side, acted as if he had a gun, hit Mr. Lindsey in the head a couple of times, and pulled him from the car. He thought Mr. McDonald hit Mr. Rucker with the gun because he saw Mr. Rucker's mouth bleeding but said he did not see Mr. McDonald hit Mr. Rucker. He said the Defendant hit him, took his wallet from his back pocket, and ran across the street. He said Mr. McDonald returned to the blue car and rode away. He estimated the amount of money in his wallet was between $50 and $100.

Mr. Lindsey testified that the Defendant wore a Halloween costume and that Mr. McDonald wore regular clothes. He said he was eighteen or nineteen years old at the time of the robbery. He said that a witness called the police and that when the police arrived, they had two men with them. He said he identified the Defendant as the man who robbed and assaulted him and Mr. McDonald as the man who assaulted Mr. Rucker. He said Mr. Rucker was shot and killed before the trial.

On cross-examination, Mr. Lindsey testified that he did not remember the amount of money in his wallet that night but agreed it was around $47, which was what he told police. He said that neither man wore a mask, that he had not seen the Defendant before that night, and that he had seen Mr. McDonald a couple of times at the bus station but had never spoken to him. He said that Mr. McDonald had a gun and that although he never saw the Defendant with a gun, the Defendant acted like he had one. He said the Defendant did not touch Mr.

Rucker. Upon questioning by the trial court, Mr. Lindsey said that Mr. McDonald got into the car with the woman.

Metropolitan Nashville Police Officer Jimmy Gregg testified that he responded to a robbery call on October 31, 2009, a little after 9:00 p.m. He said that as he drove toward the scene, he saw a car driving away from Nashville matching the description of the suspects' car, which was a dark-colored Ford Mustang. He said he turned around, stopped the Mustang, and waited for backup before approaching the car. He said he turned on the spotlight in his police cruiser and saw a man on the backseat of the Mustang removing a bandana from his face. He said that when he approached the Mustang, he found a woman driving and another woman and the Defendant on the backseat. On cross-examination, Officer Gregg said that the people in the car were searched and that none had a gun.

Metropolitan Nashville Police Officer Aaron Jones testified that he responded to an aggravated robbery call around 9:00 or 9:15 p.m. on October 31, 2009, and assisted Officer Gregg with the stop of the suspects' car. He said that he and other officers searched the car and that the other officers found a hockey mask and a wolf mask. He said that the police seized a wallet, a white mask, and a blue bandana. On cross-examination, Officer Jones said he did not know if a gun was found on the Defendant.

Metropolitan Nashville Police Detective Stefhen Holland testified that on October 31, 2009, he assisted Officer Gregg in the stop of a car that matched the description of a car used in a robbery earlier. He helped search the trunk and found a hockey mask. He said that after he found the mask, he looked across the street and saw a black male wearing a reddish, baggy polo shirt walking toward Nashville. He said that a male and two female suspects were in custody and that there was an outstanding suspect. He said the three in custody told the police they had recently taken a friend to a gas station nearby and described the clothing the friend wore. He said the man he saw across the street, later identified as Mr. McDonald, matched the description and was walking from the direction of the gas station.

Detective Holland testified that he and Officer Marshall Cruz drove across the street to confront Mr. McDonald and that when Mr. McDonald saw them, he turned into the parking lot of a Mexican restaurant and began walking away. He said that as they approached Mr. McDonald, he patted his left hip, which Detective Holland thought indicated he had a weapon. He said they drove around the building and blocked Mr. McDonald's path. He stated that he provided cover while Officer Marshall frisked Mr. McDonald and that he saw a gun in the front, left waistband of Mr. McDonald's pants. He said that after the gun was removed, it was determined to be a "very realistic looking B.B. gun." He said they took Mr. McDonald to the scene of the robbery to conduct a "show up." On cross-examination, Detective Holland said that no gun was found in the search of the blue car.

Javaelon McDonald testified that he faced charges for three counts of aggravated robbery and that the Defendant was his codefendant. He said he and the Defendant were "locked up" for aggravated robbery on October 31, 2009. He said that he saw the Defendant at 10:00 or 10:30 that morning at the bus stop and that the Defendant was in a blue Mustang with another man and three women, Ashley, Jasmine, and Shawndraka. He said that they asked him to return something to Walmart for them because he had identification and that he got into the car. He said that he entered Walmart with the Defendant, Ashley, and Jasmine, made some returns, and purchased a "Jason" hockey mask. He said they returned to the car and went to another store to purchase Halloween costumes for the women. He said they drove to west Nashville, dropped off Shawndraka and the other man around 6:30 or 6:45 p.m., and went to 100 Oaks Mall.

Mr. McDonald testified that the Defendant, Jasmine, Ashley, and he were in the blue car with Jasmine driving and that later that night, they planned to rob people, return to the house in west Nashville, and go to a club. He said that when they were buying Halloween costumes, they decided to rob people that night. He said that he asked the Defendant if he "would be jacking" people, which he said meant robbing people, and that the Defendant said, "[S]ometimes." He said that he told the Defendant his plans to rob people and that the Defendant wanted to come with him. He said that at first, he wanted to go alone but that when the Defendant insisted, he allowed the Defendant to come. He said this occurred before they dropped off Shawndraka. He said Jasmine and Ashley knew his and the Defendant's intentions.

Mr. McDonald testified that they drove around for a "little bit" before going to 100 Oaks Mall where more people were likely to be. He said that when they drove off the ramp to 100 Oaks Mall, they were in front of the movie theater and that he saw who he thought were "a dude and a girl" in a car. He said that he walked toward the two victims one way and that the Defendant went around the car to block their path. He said he and the Defendant both stated "trick or treat." He said that one victim took money from her wallet and handed it to him but that he took the wallet. He said that she asked for the return of her wallet but that he told her no and placed the wallet in his back pocket. He said that the other victim opened the car door, grabbed her purse, and attempted to take money from the purse but that he took the purse from her. He said the Defendant told the second victim to move and got into her car. He said he told the victims to lie down and told the Defendant to come on. He did not know about the kicking. He admitted that he had a gun, that he pointed it at the first victim, and that he took the money from the victims. He said the Defendant was on the other side of the first victim.

Mr. McDonald testified that he wore a red polo shirt, blue jeans, black "Air Force Ones," and a "Jason" hockey mask and that the Defendant wore a black, "dress-like" costume

and a wolf mask. He said he took a purse from the second victim and did not know what the Defendant took from the car. He said they ran off but did not know where Jasmine and Ashley were. He said that when Jasmine and Ashley arrived, they jumped into the car and drove down the street. He said that when he looked inside the purse, he found an iPod and a wallet with money, identification, and credit cards. He said he threw the purse and wallet in a trash can at a gas station but kept the iPod, identification, and credit cards.

Mr. McDonald testified that Jasmine drove because she was the only one with identification. He said that they were stopped by the police for driving the wrong way down a one-way street, that they planned to return to the house in west Nashville at 8:00 p.m., and that it was 8:15 or 8:30 after they were stopped by the police. He said that he wanted to return to the house but that the Defendant did not because they had not "really did nothing." He said that he told the Defendant they could not be greedy but that the Defendant wanted to commit another robbery. He said he agreed and told the Defendant it was his fault if they were "locked up." He said they drove toward Murfreesboro Road and Thompson Lane because he knew that was where "some Mexican people live, and they keep their money on them."

Mr. McDonald testified that they went to an apartment complex off of Thompson Lane, that Jasmine parked, and that he placed his hockey mask on top of his head. He said that he and the Defendant left the car and walked toward the apartments but that he heard cursing and arguing behind him. He said that Jasmine was arguing with the passenger of another car because the two cars almost collided and that he told Jasmine she was drawing attention to them and would get him in trouble. He said Jasmine told him the passenger in the other car called her a "b----." He said that he opened the door of the other car, hit the passenger, asked him, "[W]ho is a b---- now?" and told him to apologize to Jasmine. He said that when the passenger reached for something, he pulled out his gun and that the passenger sat back on the seat. He said that when the passenger would not apologize, the driver told Mr. McDonald that the passenger apologized. He said that he told the driver he wanted to hear the passenger apologize and that the driver continued stating the passenger was sorry. He said that the Defendant stated the passenger was not sorry, opened the driver's side door, "snatched" the driver from the car, and began hitting him. He said that Jasmine and Ashley pulled away and that he continued hitting the passenger because he would not say anything. He said that he heard the Defendant say, "[H]old on, cuz," and that when he looked, the Defendant was holding a blue bandana. He said he only interacted with the passenger, not the driver.

Mr. McDonald testified that when he left the scene, he ran toward the apartments across the street and that he did not return to the Mustang. He said he went through a hole in the fence behind the apartments. He said he walked on Murfreesboro Road because his

phone was dead and he had no way to contact Jasmine and Ashley to find the car. He said that when he was walking toward the bus stop, he looked across the street to his left and saw the blue Mustang stopped and surrounded by about eight police cars and that he kept his head down and kept walking. He said that a police car pulled in front of him as he walked, that he turned as if he were going to the Mexican Restaurant, that another police car turned behind him, and that the officers stopped and handcuffed him. He said that when the police searched him, they found a black B.B. gun and the iPod he had taken from a victim at 100 Oaks Mall. He stated that the police questioned him after he was arrested and that he told the truth. He said the State had not promised him anything in exchange for his testimony.

On cross-examination, Mr. McDonald testified that he hoped his testimony would be taken into consideration when he was sentenced. He admitted that it was his idea to rob people for money and that he told the Defendant his plan. He said that he had a gun and that the Defendant did not. He agreed that he, not the Defendant, took the wallet and purse from the victims at 100 Oaks Mall and told them to lie on the ground. He said the Defendant stood and watched him. He agreed that when he was stopped that night, he was found with a gun, an iPod, a Blackberry cell phone, two ladies' rings, two credit cards, a Social Security card, and cash but said he and the Defendant split the money. He said that during the altercation with the two men, he hit the man four or five times with a closed fist. He denied taking the man's wallet or seeing anyone take anything. He said he had never seen either man before that night. He said the rings did not come from the purse but asserted his Fifth Amendment privilege when asked where he obtained them.

On redirect examination, Mr. McDonald testified that he hit the man on the passenger's seat with this hand and had his gun in his other hand. He agreed he saw the Defendant "dealing with" the driver but said that his attention was on the passenger and that he did not see what the Defendant was doing.

Metropolitan Nashville Police Detective Gregg Jennings testified that he responded to a robbery on Thompson Place on October 31, 2009, around 9:00 or 9:15 p.m. but that before he reached the scene, he was redirected to the location where officers had stopped the suspects' car. He said that when he arrived, he found a blue Mustang stopped and two women and one man in custody. He said that other officers saw another suspect walking and stopped him. He said he and his partner went to the scene of the apartment complex robbery and spoke with the two victims, Mr. Lindsey and Mr. Rucker. He said he listened to short versions of their stories and arranged a "show up," which he explained meant that officers brought the suspects to the scene for the victims to identify in the same area, lighting conditions, and environment that the robbery occurred. He said he spoke with another officer who had a suspect in the back of his police car and told him to pull to the side of the apartment building where the victims could not see, take the suspect out of the police car, and

remove his handcuffs to avoid prejudicing the identification. He said that he walked each male victim around the building and asked if they recognized the suspects and that each positively identified both suspects.

Detective Jennings testified that the only adult in the blue Mustang was the Defendant and that the two women in the car were juveniles. He said the Defendant wore a black, jumpsuit-style Halloween costume with a skeleton design, and he identified photographs of the costume. He said Mr. McDonald wore a long-sleeved shirt under a red, three-button polo shirt and identified photographs of Mr. McDonald's clothing. He said that when he received the robbery call, he did not know that the suspects were wearing masks or that they had been involved in a robbery earlier.

On cross-examination, Detective Jennings testified that he interviewed Mr. McDonald about the incident and that Mr. McDonald was found with a B.B. gun, a Blackberry, an iPod, and two ladies' rings. He said Mr. McDonald initially told him he got the iPod from someone at the bus station and the rings from a girlfriend, which was not true. He said that the rings did not come from the two male victims and that the he did not know about the female victims at the time of the interview because their robbery was in a different precinct. He said Mr. McDonald admitted pointing a fake gun at the men and punching one several times but denied taking $47 from them.

Metropolitan Nashville Police Sergeant Robert Peterson testified that he investigated the Defendant and that he reviewed many hours of the Defendant's recorded jail telephone calls. Three calls were admitted and played for the jury. In the first call, the Defendant said that "his dumb a-- admitted to it, you feel me," that the other two girls who were "locked up" did not have anything to do with it, and that he did not understand why the two girls were "locked up." He said he needed to talk to a woman to tell her what to say, but according to a male caller, the woman had gone to see Jasmine. He said three of the victims were coming to court and discussed the benefits of someone not coming to court. The caller assured the Defendant the person would not come. The Defendant said the robbery of the "two dudes" was going to be dropped to a lesser charge because he did not have a weapon and just beat up the victim.

In the second call, another male caller said that he had spoken with a victim and that the victim only wanted his wallet and $47 returned. The caller said he told the victim that he would have to speak with the Defendant about the wallet but offered to pay him $47. The caller said the victim told him the case was "out of his hands" because the "State was taking it over."

In the third call, the Defendant said he knew how he was going to "get out of all of it." He said "Maybay" was stupid and "admitted to it trying to get a deal." He said he told the police he did not know anything. He said the two girls were innocent and did not know why they were "locked up." A male caller told the Defendant that the Defendant's grandmother told the Defendant's father that the caller "played a part." The caller said that a victim told him he wanted his wallet and money and that he offered to pay the victim. The Defendant told his grandmother and the male caller that if they talked to Jasmine to tell her to "hold it down" because "he's got them."

The Defendant testified that all he remembered was waking in booking when someone told him to strip because they needed to search him. He said he was high on cocaine and ecstasy that night.

On cross-examination, the Defendant testified that he remembered waking in booking on October 31, 2009, but did not remember the time. He said that he was clothed, that someone told him to stand to be searched, and that he was searched. He said he stayed in the booking room until someone took him upstairs where he received clothes, toothpaste, and a toothbrush. He said that he was given a "yellow thing" to wear and that he changed clothes. He said the police took the clothes he wore, but he did not remember if that included a Halloween costume. He could not recall his last memory before being awakened in booking.

The Defendant testified that Mr. McDonald was "somebody he met" and that he did not know where they met but that he thought they went to school together. He said that he saw Mr. McDonald in the courtroom during the trial but that he did not remember the last time they were together. He said he did not understand why he was in court. He denied being under the influence of ecstasy or cocaine during the trial. He did not remember discussing the events of that night with the prosecutor a couple months before the trial. He said all he remembered was someone tapping him on the shoulder, telling him to stand up, and searching him. He did not remember sitting on the stand and discussing the October 31, 2009 events a few months previously. He did not remember telling the trial court under oath that he was at the Marriott downtown on October 31, 2009, or remember being in court on April 28, 2011.

The Defendant denied that the voice on the jail telephone calls was his and said the only person he called was his mother. He did not remember pleading guilty to robbery on July 18, 2008, and denied being convicted of two counts of fraudulent use of a credit card on March 22, 2011.

-11-

The transcript shows that on rebuttal, the April 28, 2011 transcript was read into the record by the prosecutor. However, the April 28, 2011 transcript's contents are not in the trial transcript or included as an exhibit.

Detective Jennings was recalled as a rebuttal witness and testified that the Defendant told him his birthday and Social Security number and that he identified the Defendant's "OCA" number, which he agreed was a unique number assigned to anyone arrested in Davidson County. The State introduced certified copies of the Defendant's two fraudulent use of a credit card convictions and one robbery conviction.

Upon this proof, the Defendant was convicted of three counts of aggravated robbery and one count of assault. The trial court sentenced the Defendant as a Range II, multiple offender to eighteen years for the aggravated robbery convictions in Count 1 and 4, twenty years for the aggravated robbery conviction in Count 3, and eleven months, twenty-nine days for the assault conviction. The court ordered the Defendant to serve Counts 1 and 3 consecutively, for an effective thirty-eight-year sentence.

**I**

The Defendant contends that the evidence is insufficient to sustain his convictions. He argues that Ms. Wright and Ms. Wiser could not identify him. He also argues that it was Mr. McDonald's idea to rob people, that he was unaware property was being taken from the male victims, and that Mr. McDonald testified that the Defendant never possessed a gun. The State counters that the evidence is sufficient to prove the Defendant committed the crimes and argues that he was responsible, "at the very least, under a theory of criminal responsibility." We conclude that the evidence is sufficient to support the convictions.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). The standard of proof is the same whether the

evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(a), -402(a)(1) (2010). A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2). To be criminally responsible for the acts of another, a defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). In other words, the defendant must "'knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime.'" *Maxey*, 898 S.W.2d at 757 (quoting *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). The requisite criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense . . . ." *State v. McBee*, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

In the light most favorable to the State, the evidence shows that Mr. McDonald planned to rob people on October 31, 2009, and the Defendant asked to participate. Regarding the aggravated robbery convictions in Counts 3 and 4, Randi Wright and Hannah Wiser were in a parking lot when two men in Halloween costumes came toward them. One wore a hockey mask and the other a wolf mask. The man in the hockey mask wore a "hoodie" and blue jeans, and the man in the wolf mask wore a Halloween costume with fake blood. Ms. Wright saw the robbers' hands and knew they were African-American.

Ms. Wright said both men had black guns. The man in the wolf mask pointed his gun at Ms. Wiser's hip and pushed it at her when she requested her identification. The man in the hockey mask made sure the victims did not run. When one of the victims was being robbed, the man in the hockey mask held the other victim. The man in the wolf mask took Ms. Wiser's keys, gum, and wallet with her identification and about $100, while the man in the hockey mask held her at gunpoint. The man in the wolf mask took Ms. Wright's money, GPS, and purse, which contained her keys, rings, iPod, makeup, and wallet with her debit card and identification. The man in the wolf mask held a gun to the back of Ms. Wright's

head, pulled her hair, and pushed her out of the way. The man in the hockey mask held a gun to Ms. Wiser. After the men took the victims' property, they forced the victims to the ground and kicked them. The men told the victims that if they looked up, the men would shoot them.

Ms. Wright said she was afraid during the incident. Ms. Wiser went to the hospital after the incident and later saw a therapist, who told her she had post-traumatic stress disorder. Video recordings of the parking lot confirmed the testimony of Ms. Wright and Ms. Wiser. Ms. Wright identified photographs of her stolen property that was recovered, and Ms. Wiser identified photographs of the Halloween costume the man in the wolf mask wore. Detective Jennings said the Defendant wore a black, jumpsuit-style Halloween costume when he was arrested and identified photographs of the costume, which was the same costume Ms. Wiser identified.

Regarding the aggravated robbery conviction in Count 1, Domanique Lindsey and Damian Rucker were leaving an apartment complex when they were approached by the Defendant and Mr. McDonald. A blue Mustang pulled beside Mr. Lindsey's car with a woman driving, and two men got out of the car. Mr. Lindsey said that the Defendant wore a Halloween costume and that Mr. McDonald wore regular clothes. Mr. McDonald confirmed that he wore a red polo shirt, blue jeans, and a "Jason" hockey mask and that the Defendant wore a black, "dress-like" costume and a wolf mask, which was also corroborated by Ms. Wright and Ms. Wiser's testimony. Mr. Rucker and the woman driver "exchanged words" before the two men "ripped" open the victims' car doors. Mr. McDonald waved a gun inside. The Defendant acted as if he had a gun, hit Mr. Lindsey in the head a couple times, pulled Mr. Lindsey from the car, and took Mr. Lindsey's wallet. Mr. Lindsey said that Mr. McDonald had a gun and that he never saw the Defendant with a gun but that the Defendant acted like he had one.

When the police stopped the blue Mustang, a woman was driving and another woman and the Defendant were on the back seat. During the stop, Mr. McDonald was seen across the street and arrested. During a search of the car, officers found a hockey mask and a wolf mask and seized a wallet, a white mask, and a blue bandana. During a search of Mr. McDonald, the police found a "very realistic looking B.B. gun," an iPod that he said he took from the victim at 100 Oaks Mall, a Blackberry cell phone, two ladies' rings, two credit cards, a Social Security card, and cash. Mr. McDonald said he and the Defendant split the money. During a "show up" on the night of the robbery, Mr. Lindsey and Mr. Rucker both identified the Defendant and Mr. McDonald as the men who robbed them.

During the Defendant's recorded jail telephone calls, the Defendant said the robbery of the "two dudes" was going to be dropped to a lesser charge because he did not have a weapon and just beat up one of the victims. The Defendant's callers admitted trying to give

one of the victims the $47 the Defendant had stolen from him. The Defendant said that Mr. McDonald had admitted everything and told the callers that if they talked to Jasmine to tell her to "hold it down" because "he's got them."

Regarding the assault conviction in Count 2, Mr. Lindsey thought Mr. McDonald hit Mr. Rucker with the gun because he saw Mr. Rucker's mouth bleeding. Mr. McDonald admitted that he opened the door of the other car, hit the passenger, asked him, "[W]ho is a b---- now?" and told him to apologize to Jasmine. He admitted that when Jasmine and Ashley pulled away, he continued hitting the passenger because he would not say anything. Although no evidence exists showing that the Defendant assaulted Mr. Rucker, he is criminally responsible for the actions of his codefendant. The record shows that he initiated the second robbery and was present at the scene of the offense. The assault was committed in furtherance of the aggravated robbery and was a natural and probable consequence of the robbery. *See State v. Carson*, 950 S.W.2d 951, 956 (Tenn. 1997).

The Defendant argues that Ms. Wiser and Ms. Wright could not identify him and noted only that their assailants had African-American hands and the type of masks worn. Although Ms. Wiser and Ms. Wright could not identify their assailants, their stolen property was found in Mr. McDonald's possession when he was searched. A wolf mask, a hockey mask, and a black Halloween costume, which was identified by Ms. Wiser and Detective Jennings, were found in the blue Mustang in which the Defendant was riding when the police stopped it.

Although there was conflicting testimony about whether the Defendant had a gun, the record shows that he assisted with the commission of the offenses by holding Ms. Wright and Ms. Wiser while Mr. McDonald robbed them and by opening Mr. Lindsey's door, hitting him, and taking his wallet while Mr. McDonald addressed Mr. Rucker and waved a gun inside the victims' car. The Defendant aided Mr. McDonald in the completion of the offenses and is criminally responsible for his actions. *See* T.C.A. § 39-11-402(2). The evidence is sufficient to support the Defendant's convictions.

## II

The Defendant contends that the trial court erred in finding he was a dangerous offender to enhance his sentence and in failing to give sufficient weight to his mental health issues. The State contends that the Defendant has waived the issue by failing to cite to the record or proper legal authority to support his argument. In the alternative, the State contends that the court did not abuse its discretion and properly sentenced the Defendant. Because the Defendant has not provided an adequate record for our review, we presume that the evidence supported the trial court's findings.

Regarding the State's waiver argument, we note that the Defendant's brief is lacking in specific, factual argument regarding his sentencing issue, and the argument portion of his brief regarding sentencing does not cite to the record. We agree with the State that the Defendant's brief does not meet the requirements of Tennessee Rule of Appellate Procedure 27(a)(7)(A), which requires an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Although deficient, the Defendant's brief contains citations to the record in its statement of facts and in its argument portion regarding his first issue, and the Defendant's argument is not entirely lacking specific contentions. We will consider the Defendant's sentencing issue.

At the sentencing hearing, a presentence report and victim impact statements from Ms. Wiser and Ms. Wright were admitted as exhibits. Because these convictions were part of a case number for which other charges had been previously tried, the State requested that the trial court consider testimony from the first case, testimony from the Defendant, Jeff Blume, and Sergeant Peterson from the previous sentencing hearing, and Dr. Kimberly Brown's testimony at a pretrial hearing. Defense counsel requested that the court consider testimony from the Defendant's family members at the previous sentencing hearing concerning his mental health status and the mitigation factors of his mental health status.

The Defendant testified that he did not remember discussing his mental health status at a previous hearing. He denied having anything to tell the trial court about his mental health. He denied wanting to make a statement to the court about his sentencing. Because testimony from previous hearings was relied upon by the parties, the court took the sentencing under advisement. The court sentenced the Defendant as a Range II, multiple offender to eighteen years for the aggravated robbery convictions in Counts 1 and 4, twenty years for the aggravated robbery conviction in Count 3, and eleven months, twenty-nine days for the assault conviction. The court ordered the Defendant to serve Counts 1 and 3 consecutively, for an effective thirty-eight-year sentence.

We note that the Defendant has failed to include in the appellate record the transcripts of the previous proceedings, which the State and defense counsel requested the trial court to consider. We conclude that this failure precludes an adequate review of his sentence and requires this court to presume that the evidence supported the sentences.

On appeal, the Defendant was required to prepare a record that conveyed a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal. T.R.A.P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). The facts and circumstances of the earlier trial and sentencing hearing were relevant to the

-16-

trial court's sentencing determination, and the transcripts recording those facts and circumstances or a statement of such is absent from the record. "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *see also State v. Roberts*, 775 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Nothing in the existing record shows otherwise. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH  M.  TIPTON,  PRESIDING  JUDGE